

**DAVIS LAW FIRM**
— Criminal & Family Trial Attorneys —

**MARK G. DAVIS, Esq.**
Member, PA & NJ Bar
Certified by the Supreme Court
of New Jersey as a Criminal Trial Lawyer

**NIKKI J. DAVIS, Esq.**
Member, NJ Bar

March 25, 2022

<u>Via Email - Not Filed via ECF</u>
Honorable Noel L. Hillman
United States District Judge
District of New Jersey
Mitchell H. Cohen Building & U.S. Courthouse
One John F. Gerry Plaza
4th & Cooper Streets
Camden, New Jersey 08101

   **Re:** **United States v. Mark D'Amico**
      **Crim. No. 1:20-cr-21 (NLH)**
      -------------------------------------------

Dear Judge Hillman:

  Defendant Mark D'Amico ("D'Amico"), by and through undersigned counsel, respectfully submits this memorandum to assist the Court in reaching a fair and just sentence that is not greater than necessary to accomplish the fundamental objectives of sentencing as articulated in 18 U.S.C. §3553(a).

  For the reasons that follow, the defense submits that a sentence of imprisonment *below* the advisory Guidelines range of 21 to 27 months would be fair and just under the circumstances.

I.  SENTENCING CONSIDERATIONS

According to the Supreme Court, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Gall v. United States, 128 S.Ct. 586, 598 (2007), quoting Koon v. United States, 518 U.S. 81, 113 (1996). This tenet was expanded by the Court in United States v. Booker, holding that those provisions of the federal Sentencing Reform Act of 1984 that make the Guidelines mandatory (18 U.S.C. §3553(b)(1)), or which rely upon the Guideline's mandatory nature (18 U.S.C. §3742(e)), are incompatible with the Sixth Amendment. 543 U.S. 220, 224 (2005). As a result, the Court severed those troubled provisions, rendering the Guidelines "effectively advisory." Id. at 245.

The Third Circuit has developed a three-pronged approach to sentencing that district courts must follow in the wake of Booker:

(1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before Booker.

(2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-Booker case law, which continues to have advisory force.

(3) Finally, they are required to exercise their discretion by considering the relevant §3553(a) factors in setting the sentence they impose regardless of whether it varies from the sentence calculation under the Guidelines. United States v. Gunter, 462 F.3d 237, 247 (3rd Cir. 2006) (quotation marks, brackets, and citations omitted), citing United States v. King, 454 F.3d 187, 194, 196 (3rd Cir. 2006); United States v. Cooper, 437 F.3d 324, 329-30 (3rd Cir. 2006).

Accordingly, the first and second prongs seemingly mirror the pre-Booker scheme in which any sentence outside the applicable sentencing range must be imposed pursuant to the departure framework provided by the Guidelines.

However, it is 18 U.S.C. §3553(a) that ultimately governs the imposition of the defendant's sentence, with the Guidelines calculation acting as only one of the many

factors and considerations contained in the statute. See Booker, 543 U.S. at 246. As the Supreme Court has clearly opined, a sentencing judge "may not presume that the Guidelines range is reasonable." Gall, 128 S.Ct. at 596-97. Rather, it is the mandate in Section 3553(a) that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with purposes set forth in paragraph (2) of this subsection," that guides trial courts' sentencing determinations. 18 U.S.C. §3553(a) (emphasis added). These purposes, as enumerated in 18 U.S.C. §3553(a)(2), include "the need for the sentences imposed:

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed education and vocational training, medical care, or other correctional treatment in the most effective manner.

Also, sentencing courts are directed to consider the following factors:

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. §3553(a)(1));

    (2)    the purposes of sentencing (18 U.S.C. §3553(a)(2));

    (3)    the kinds of sentences available (18 U.S.C. §3553(a)(3));

    (4)    recognition and consideration of the kinds of sentences and applicable guideline range (18 U.S.C. §3553(a)(4));

    (5)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct (18 U.S.C. §3553(a)(6)); and

    (6)    the need to provide restitution to any victims of the offense (18 U.S.C. §3553(a)(7)).

According to the Third Circuit, "[t]he record must demonstrate the trial court gave meaningful considerations to the §3553(a) factors. Cooper, 437 F.3d at 329.

## II.  U.S.S.G. §3553(a) SENTENCING CONSIDERATIONS

In agreement with the government, the defense acknowledges that the U.S. Probation Office correctly calculated Mr. D'Amico's total offense level of 16 (█████ █████; that his previous criminal case information establishes a Criminal History Category of I (█████████); that the applicable Guidelines range is 21-27 months' imprisonment (█████████); and that such range is in Zone D of the Sentencing Table (█████████).



Mr. D'Amico submits, however, that, after applying the statutory factors in 18 U.S.C. §3553(a) to his case, the purposes of criminal punishment would be satisfied by the imposition of a sentence of imprisonment *below* his Guidelines range. Such a variance would allow Mr. D'Amico to serve an appropriate period in BOP custody while still maintaining a reasonable hope of returning to the productive, lawful lifestyle he has created with his new family over the past three years.

The defense takes exception to the government's suggestion in its memorandum that Mr. D'Amico deserves a high-range sentence because, in part, he never intended the GoFundMe donations to be used for the aid or betterment of someone in need, namely Johnny Bobbitt. That is simply untrue. Mr. D'Amico has accepted responsibility for the underlying conspiracy and his role in falsely presenting Bobbitt as a "Good Samaritan," and for subsequently misappropriating a substantial portion of those funds with his then-girlfriend, Kate McClure. But, initially, Mr. D'Amico's intentions were pure and altruistic.

As stated during his Rule 11 hearing, he originally befriended Bobbitt as a veteran who was visibly drug-addicted, down-on-his-luck, and in need of immediate help and basic services. Bobbitt was a very kind and personable soul; and Mr. D'Amico felt sympathetic to him, routinely giving money, food, essential items, and any other handouts he could muster. But, in addition to said personal offerings not being sustainable to Mr. D'Amico, they only seemed to address Bobbitt's short-term needs – the larger, more pressing issues, *e.g.* homelessness, poverty, and drug-addiction, continued unabated, with no promising signs of recovery. So, he and McClure started to brainstorm and conjure ideas that would assist Bobbitt in getting clean and back on his feet. Bobbitt's real circumstances of being a homeless, drug-addicted veteran, panhandling on the side of the road, albeit sad and heartbreaking to them, struck Mr. D'Amico and McClure as being too common and generic to merit a worthy GoFundMe compaign. So, regrettably, they agreed to characterize Bobbitt as someone who helped McClure in her time of need.

Notwithstanding this fraudulent characterization, however, Mr. D'Amico intended for all anticipated donations to aid and benefit Bobbitt in his road to recovery.

The stated monetary goal of the GoFundMe campaign was a modest $10,000. The defense submits that this not an arbitrary number. To the contrary, this amount directly correlated with a specific list of expenses that Mr. D'Amico believed would be necessary to help Bobbitt beat the odds and regain his life: (i) six months of affordable shelter; (ii) reasonably priced vehicle; (iii) new clothing; (iv) substance abuse program(s); and (v) a mobile phone. Mr. D'Amico, however, failed to consider or prepare for two critical realities at the outset of this campaign – one, that opioid addiction is a powerful, crippling disease subject to recurring relapse and requiring intensive, ongoing treatment; and two, that Mr. D'Amico's own vices rendered him ill-equipped to handle the temptations of quasi-fame and seemingly unlimited monetary access. As the donations poured in, far exceeding the original goal, the media frenzy ensued and it soon became abundantly clear that Mr. D'Amico was in over his head. But his road-to-hell was paved with good intentions.

Mr. D'Amico managed to fulfill many of his stated promises and goals to Bobbitt from the GoFundMe funds. Per Bobbitt's request, he was purchased a $22,0000 trailer for shelter in which he and his brother lived for about three months; he was purchased a total of two vehicles (costing $2,500 and $4,5000) which were later sold or traded by Bobbitt for drugs; he was purchased a new wardrobe; he was purchased an apple laptop and two iphones, which were later sold or traded by Bobbitt for drugs; he was opened a checking account with $25,000, which was drained in a matter of weeks and used by Bobbitt to buy drugs; and, for about the first three months, he was given between $500-1,000 in cash *every* day by Mr. D'Amico. And these substantial expenditures were all in addition to: D'Amico driving Bobbitt to a substance abuse clinic in Camden, NJ on a daily basis; D'Amico working tirelessly, yet unsuccessfully due to Bobbitt's refusal, to get him admitted to inpatient rehabilitation programs; D'Amico providing Bobbitt with food and other basic needs, as needed; and D'Amico enduring theft by Bobbitt of his personal belongings, e.g. vehicle, video gaming consoles, and Beats headphones.

To be clear, Bobbitt was extremely gracious and appreciative of Mr. D'Amico's efforts up to this point. And he expressed that gratitude by telling Mr. D'Amico and McClure to share in his newfound success and use the funds to buy things for themselves. So, although the government would prefer to label Mr. D'Amico a swindling con-man and call it a day, it simply was not that cut-and-dry. Yes, he acted as a gatekeeper to the funds and eventually cut Bobbitt off completely; but, at that time, it seemed to be the right course of action, given what Mr. D'Amico had personally observed of and experienced with Bobbitt. As we now know, however, those actions were ill-advised. Mr. D'Amico

placed himself squarely in the middle of a media frenzy, with unfettered access to the remaining monies, and a debilitating penchant for risk-taking and gambling. This was his tragic flaw, and he makes no excuses for the behavior that followed. He has admitted his wrongdoing, accepted criminal responsibility, and will repay his debt to GoFundMe after society receives its debt of time served.

For the past three years, Mr. D'Amico has made tremendous efforts in demonstrating to his loved ones, close friends, colleagues, the government, and this Court that he has course-corrected his life and will never again be victimized by his own shortcomings or recklessly poor decision-making.[1] As documented in the PSI report, Mr. D'Amico has spent all of his time over the few years either spending quality time with his girlfriend, Gina, and two-year old daughter, ▮, or working hard to provide for them and save for his anticipated imprisonment. Working between fifty and sixty hours a week as an independent construction contractor has bestowed Mr. D'Amico with much-needed consistency, discipline, and purpose in his life. He has committed fully and honestly to both hard work and his family unit. For the first time in a long while, he has earned the pride and adoration of loved ones. Given his new motivation and focus, Mr. D'Amico is determined to continue pushing and elevating himself, regardless of his impending incarceration. He sees this for what it is – a valuable lesson learned, but never to be repeated.

Nothing is more important to Mr. D'Amico than returning as quickly as possible to his work and family. Over the past three years, he has experienced some significant "firsts" in life – his first healthy, loving relationship; first child; first long-term career plan; and first-time freedom from gambling and other vices. Beyond showing what Mr. D'Amico has accomplished during the pendency of prosecution, these milestones illustrate exactly what he will be fighting to preserve and return to upon his release. After four decades of life, he appears to have finally entered adulthood and embraced a healthy, traditional lifestyle. And while Mr. D'Amico appreciates the hardship – financial or otherwise – suffered by every dependent family of an imprisoned individual, he is overwhelmingly concerned that a prolonged absence from society will adversely affect the stability and well-being of his own.

The defense finally submits that our criminal justice system has demonstrated time and again how effective it is at righting wrongs and punishing defendants for their abhorrent behavior. It is our hope – and request – that this Court will also show that the system is equally equipped and willing to exercise leniency on those deserving of second

---

[1] Attached please find notarized letters to the Court from individuals attesting to their opinions of Mr. D'Amico's changed behavior and character.

chances and actively engaged in returning their lives to a normal, law-abiding track.

### III. CONCLUSION

Based on the foregoing, Mr. D'Amico respectfully requests that this Honorable Court impose a sentence of imprisonment *below* the advisory Guidelines range of 21 to 27 months; and that such term be run concurrent to the anticipated State sentence for related conduct. Such sentence will be "sufficient but not greater than necessary" to accomplish the purposes of punishment, as set forth by governing law.

Respectfully Submitted,

MARK G. DAVIS
Attorney for Defendant

cc: Daniel Carney, USPO, (via email)
Jeffrey Bender, Esq., AUSA (via email)
Diana Carrig, Esq., AUSA (via email)